UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ARMOND BROWN, ET AL. | CIVIL ACTION |
| VERSUS | NO. 17-3445 |
| KENNER POLICE DEPARTMENT, ET AL. | SECTION "R" (3) |

## ORDER AND REASONS

Before the Court is defendants' motion for summary judgment on the grounds that (1) defendant Officer Michael Romano is entitled to qualified immunity, and (2) plaintiffs have failed to state a claim against defendant City of Kenner under *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978).[1] The undisputed evidence before the Court establishes that Officer Romano's use of deadly force was not clearly unreasonable. He therefore did not violate the constitutional rights of Armond Jairon Chauncey Brown (Jairon Brown), and is entitled to qualified immunity. And in the absence of a constitutional violation there can be no municipal liability under *Monell*. The Court therefore grants defendants' motion.

---

[1] R. Doc. 35.

# I.   BACKGROUND

This case arises out of the death of Jairon Brown.[2]  Brown, who was diagnosed with schizophrenia and bipolar disorder, was shot and killed by Officer Romano of the Kenner Police Department in the front yard of his home.[3]  The material facts are as follows.

On the morning of January 23, 2017, at 11:02 a.m., the Kenner Police Department received a call from Joshua Brown, Jairon Brown's half-brother.[4]  Joshua told the dispatcher that his half-brother was "swinging a knife" at him when Joshua tried to enter the house in which the brothers resided.[5]  Joshua later testified that when he arrived home, Jairon went to the kitchen, retrieved a knife, and started "showing" the knife to him.[6]  The brothers' father, Armond Brown, Sr., who lived in the same house, testified that when Joshua came home, Jairon "had a knife in his hand[] and told Joshua to roll out."[7]

At least two Kenner police officers arrived at the scene, spoke with Joshua, and then approached the front door of the residence to attempt to

---

[2]   R. Doc. 13.
[3]   *Id.* at 6 ¶ 13; R. Doc. 50-2 at 5-6.
[4]   R. Doc. 35-4 at 2; R. Doc. 51-3.
[5]   R. Doc. 51-3.
[6]   R. Doc. 50-2 at 40-41.
[7]   R. Doc. 50-3 at 49.

make contact with Jairon.[8]   When these attempts were unsuccessful, the police officers told Joshua that in order to get help for his brother, he had to obtain an order for protective custody from the Jefferson Parish coroner.[9] Joshua left the residence with an officer to sign the necessary paperwork,[10] and the coroner's office issued the order for protective custody shortly before 1:30 p.m.[11]  The order authorized the police officers to remove Brown from his home and take him to Oschsner Hospital in Kenner for an immediate psychiatric examination.[12]

More police officers had arrived at the scene by the time the order was formally issued.[13]   The officers established a secure perimeter around the house and an outer perimeter on the street to control traffic and bystanders.[14] Officer Ronnie Barger, the Kenner SWAT team negotiator, first attempted to contact Brown by telephone.[15]  When that proved unsuccessful, Officer Barger used a bullhorn to attempt contact.[16]   Officer Barger asked

---

[8]     R. Doc. 35-2 at 2; R. Doc. 50-2 at 45.
[9]     R. Doc. 35-2 at 3; R. Doc. 50-2 at 46.
[10]     *Id.*
[11]     R. Doc. 35-2 at 3; R. Doc. 50 at 4.
[12]     R. Doc. 35-5 at 5.
[13]     R. Doc. 35-2 at 3; R. Doc. 50-2 at 49-50.
[14]     R. Doc. 50 at 4.
[15]     R. Doc. 35-2 at 4.
[16]     *Id.*; R. Doc. 50-2 at 50.

Brown to leave the residence and told him that the police wanted to help him.[17]

Members of the Kenner SWAT team then attempted to breach the front door of the house in order to make visual contact with Brown.[18]  When the officers opened the front door, they observed Brown standing near the door with two knives in his hands and in a "squatted" or "defensive" stance.[19] Some of the officers described Brown as having a "thousand-yard" or "blank" stare on his face.[20]  The officers instructed Brown to drop his knives, but he did not comply.[21]  The officers then fired sponge rounds and a Taser at Brown.[22]  The sponge rounds hit Brown in the thigh area but did not incapacitate him.[23]  The Taser fire directly hit him, but it likewise had little effect.[24]

---

[17]     R. Doc. 35-2 at 4; R. Doc. 50-2 at 50.
[18]     R. Doc. 35-2 at 5; R. Doc. 50-2 at 50-51.
[19]     R. Doc. 35-12 at 2 (Officer Brent Donovan testifying that he observed Brown with two knives in his hands "in a squatted position, like almost like a karate fighting style"); R. Doc. 50-6 at 40-41 (Officer Christopher Mitchell testifying that he observed Brown holding the two knives "in a defensive stance, defensive posture").
[20]     *See* R. Doc. 50 at 9.
[21]     R. Doc. 35-12 at 2.
[22]     R. Doc. 50-2 at 52-54; R. Doc. 35-2 at 5.
[23]     *Id.*; R. Doc. 50-6 at 42-43.
[24]     R. Doc. 50-2 at 53; R. Doc. 50-6 at 44-45.

After these attempts to incapacitate Brown, the Kenner Police Department fired tear gas into the house.[25] Brown exited the front door of the house shortly after the officers deployed the tear gas.[26] He was holding both knives and wiping his eyes with his sleeves.[27] A brick wall lines much of the Browns' front yard.[28] A footpath extends from the Browns' front door to a pedestrian gate that opens to the sidewalk.[29] Officers Romano and Brent Donovan were inside the brick wall in the front yard when Brown emerged from the house.[30] Both officers were to Brown's right and armed with rifles containing live ammunition.[31] Officers Lewis Tusa and John Cusimano positioned themselves inside the gateway at the end of the footpath, not protected by the brick wall.[32] Neither officer was armed with lethal ammunition—Officer Tusa had a Taser gun, and Officer Cusimano had sponge rounds.[33] There is inconsistent testimony regarding whether the pedestrian gate was closed in front of Officers Tusa and Cusimano when

---

[25]     R. Doc. 35-2 at 5; R. Doc. 50 at 4.
[26]     R. Doc. 35-2 at 6; R. Doc. 50-2 at 56-57.
[27]     *Id.*
[28]     R. Doc. 50-12 at 6 (aerial photograph of the Browns' residence).
[29]     *Id.*
[30]     R. Doc. 50-15 at 45-46.
[31]     R. Doc. 35-2 at 6; R. Doc. 50-15 at 42.
[32]     R. Doc. 35-2 at 6-7.
[33]     *Id.*

Brown emerged from the house.[34]   There is also inconsistent testimony regarding whether, if closed and separating the officers from Brown, the pedestrian gate was locked so that Brown would have been unable to open it to attack the officers.[35]

Brown, armed with both knives, began to walk down the footpath toward Officers Tusa and Cusimano, yelling bible verses.[36]   Officers Donovan and Romano walked parallel to Brown alongside the brick wall to Brown's right.[37]   The Kenner police officers repeatedly ordered Brown to drop his knives, but he refused.[38]   Brown stopped when he was about halfway between the front door and Officers Tusa and Cusimano.[39]   The police officers

---

[34]     R. Doc. 50-14 at 33-34 (Officer Cusimano testifying that the gate was open, and that he was positioned in the gateway); R. Doc. 50-11 at 50, 61-65 (Officer Romano testifying that the gate stood in between Officers Cusimano and Tusa and Brown, but the gate would not lock and would "sway back and forth"); R. Doc. 50-15 at 81 (Officer Donovan stating in his post-incident interview that the officers were "behind cover"); R. Doc. 50-17 at 41 (Officer Tusa stating in his post-incident interview that Officer Cusimano had "his foot in between the bars" of the pedestrian gate to "keep it shut" as Brown approached).

[35]     R. Doc. 50-11 at 61-62 (Officer Romano testifying that the gate was not locked and "could have easily been pushed open"); R. Doc. 50-12 at 3 (Armond Brown, Sr. stating in an affidavit that when the gate is closed, it "locks so that it cannot be pushed open").

[36]     R. Doc. 35-2 at 6; R. Doc. 50-2 at 57.

[37]     R. Doc. 35-2 at 6; R. Doc. 50-15 at 46.

[38]     R. Doc. 35-2 at 6; R. Doc. 50-2 at 56-57.

[39]     R. Doc. 50 at 10; R. Doc. 50-15 at 46.

continued to give him verbal commands to drop the knives.[40]  A short time later, Brown continued down the footpath.[41]  When he got closer to them, Officers Tusa and Cusimano each fired their non-lethal ammunition.[42] Shortly after they fired, Officer Romano fired multiple lethal rounds, killing Brown.[43]  Officer Romano testified that when he fired his weapon, Brown's arms were "near his side with his hands out front," and both knives were "vertical in the air."[44]  Officer Romano further stated that Brown was not attempting to strike Officer Tusa or Cusimano when he fired.[45]  Officer Donovan testified that Brown was "within an arm's reach" of the pedestrian gate when Officer Romano fired.[46]  Joshua Brown testified that at the time his brother was shot he was about seven or eight feet from the front gate where Officers Tusa and Cusimano stood.[47]  Cynthia Morell, a neighbor who witnessed the incident, stated in a sworn affidavit that Brown was "about ten feet from the front gate."[48]

---

[40]     R. Doc. 50-15 at 48; R. Doc. 50-2 at 56-57.
[41]     R. Doc. 50 at 10; R. Doc. 50-11 at 47.
[42]     R. Doc. 35-2 at 6-7; R. Doc. 50 at 21 n.45.
[43]     R. Doc. 35-2 at 6-7; R. Doc. 50-2 at 57-58.
[44]     R. Doc. 50-11 at 59.
[45]     *Id.* at 60.
[46]     R. Doc. 50-15 at 59.
[47]     R. Doc. 50-2 at 58.
[48]     R. Doc. 50-7 at 4.

Photographs taken by the Kenner Crime Scene Technician show that one of Brown's knives was a stainless steel serrated kitchen knife with a seven-inch blade.[49] The other knife was a stainless steel kitchen knife with a five-inch blade.[50]

Jairon Brown's parents, Armond Brown, Sr. and Jaronet Whitaker, and brothers, Joshua Brown and James Whitaker, Jr., filed a complaint for damages, asserting state law claims for wrongful death, survival, and intentional infliction of emotional distress, and federal civil rights claims under 42 U.S.C. § 1983, against Officer Romano and the City of Kenner, through Mayor E. "Ben" Zahn, III.[51] Plaintiffs assert that Brown was wrongfully shot and killed without just cause.[52] Plaintiffs further allege that the City of Kenner adopted policies and practices that deprived Brown of his civil rights.[53] On June 5, 2018, defendants moved for summary judgment.[54]

---

[49] R. Doc. 35-19; R. Doc. 35-24; R. Doc. 35-25.

[50] *Id.*

[51] R. Doc. 1; R. Doc. 13; R. Doc. 28. The original complaint named the Kenner Police Department as a defendant. *See* R. Doc. 1 at 2 ¶ 6. But the Kenner Police Department was omitted in plaintiffs' amended complaint, and is no longer a defendant in this matter. *See* R. Doc. 13 at 3 ¶ 6. Plaintiffs had also included Kenner Police Department Chief Michael Glaser as a named defendant, but the Court has since dismissed all claims against Chief Glaser. *Id.* ¶ 7; R. Doc. 31 at 12-13.

[52] R. Doc. 13 at 8 ¶ 18.

[53] *Id.* at 4-5 ¶¶ 10-11.

[54] R. Doc. 35.

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (internal citation omitted). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Excessive Force Claims

As a public official, Officer Romano is entitled to qualified immunity on plaintiffs' Section 1983 excessive force claim unless his conduct "violate[d] a clearly established constitutional right." *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Courts apply a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. *Harris*, 745 F.3d at 772. Under this analysis, officers are entitled to qualified immunity unless "(1) [plaintiffs] have adduced sufficient evidence to raise a genuine issue of material fact suggesting their conduct violated an actual constitutional right, and (2) the officers' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (internal quotation omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, even if the evidence supports a conclusion that plaintiffs' rights were violated, qualified immunity may still be invoked unless "the government official violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). This two-prong approach ensures that "[q]ualified

immunity shields from civil liability all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotations omitted). "Although qualified immunity is nominally an affirmative defense, the plaintiff bears a heightened burden to negate the defense once properly raised." *Newman*, 703 F.3d at 762. The Court need not apply these two prongs sequentially. *See Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

Plaintiffs allege that Officer Romano killed Jairon Brown without legal justification and in violation of his constitutional rights.[55] This excessive force claim implicates Brown's Fourth Amendment right to be free from unreasonable seizures. *See Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997). In order to show that a police officer's use of force violated Brown's Fourth Amendment rights (*i.e.*, the first prong of the qualified immunity analysis), "plaintiff[s] must establish: '(1) [an] injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). Claims of excessive force are fact intensive and depend on "the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Supreme Court has directed lower courts to

---

[55] R. Doc. 13 at 3 ¶ 7.

consider three factors in this inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest by flight. *Id.* The second factor is the only one relevant to this case.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* This is an objective standard: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *see also Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985) (court must determine whether "the totality of the circumstances justified" the particular use of force). This test "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

A clearly established right (*i.e.*, the second prong of the qualified immunity analysis) "is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). For plaintiffs to prevail against

summary judgment on the second prong, "they must show a genuine dispute of material fact on whether 'every reasonable official would have understood' the use of deadly force was objectively unreasonable under the circumstances and clearly-established law." *Clayton v. Columbia Cas. Co.*, 547 F. App'x 645, 653 (5th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This analysis does not "require a case directly on point" prohibiting the official's actions, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308. The Court must not "define clearly established law at a high level of generality," but rather must ask "whether the violative nature of *particular* conduct is clearly established." *Id.* (emphasis in original). The inquiry therefore "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

Viewing the summary judgment evidence in the light most favorable to plaintiffs leads to the following picture of the incident. Officer Romano arrived at the scene after being notified that Brown had barricaded himself in his home, that Brown was armed with two knives, and that Brown was reportedly schizophrenic.[56] Officer Romano was aware that Kenner police officers had fired non-lethal munitions at Brown, but that those munitions

---

[56]     R. Doc. 50-11 at 23-24.

failed to incapacitate him.[57]  Officer Romano then observed Brown, still armed with two knives, leave his residence and haltingly walk down the footpath towards Officers Tusa and Cusimano after the Kenner police department deployed tear gas into his home.[58]  When Officer Romano fired his weapon, Brown was ten feet from Officers Tusa and Cusimano and advancing, armed with two knives, and refusing to comply with the officers' repeated commands to drop his weapons.[59]  Again viewing the evidence in the light most favorable to plaintiffs, Officers Tusa and Cusimano were positioned immediately behind a pedestrian gate that Officer Romano believed would swing open and not protect the officers.[60]  Finally, Officer Romano testified—and plaintiffs have not clearly refuted with contrary evidence—that Brown was holding the knives in front of his body with the blades extended vertically.[61]

The Court finds that under these circumstances, Officer Romano's use of deadly force was not clearly unreasonable because he reasonably feared

---

[57]     *Id.* at 24; R. Doc. 50-2 at 52-53.
[58]     R. Doc. 50-11 at 42-43; R. Doc. 50-2 at 56-58.
[59]     R. Doc. 50-2 at 56-57 (Joshua Brown testifying that Jairon refused to drop his two knives despite verbal commands to do so, and that Jairon was walking down the footpath towards the police officers when he was shot); R. Doc. 50-7 at 4 (the Browns' neighbor stating in a sworn affidavit that Brown was "about 10 feet from the front gate" when he was shot).
[60]     R. Doc. 50-17 at 41; R. Doc. 50-11 at 61-62.
[61]     *See* R. Doc. 50-11 at 59.

that Brown posed an immediate threat to the safety of Officers Tusa and Cusimano.  *See Graham*, 490 U.S. at 396.  Officer Romano therefore did not violate Brown's Fourth Amendment rights, and he is entitled to qualified immunity under the first prong of the immunity analysis.

The Fifth Circuit has found that officers who employed deadly force under similar circumstances did not violate the victim's Fourth Amendment rights.  In *Mace v. City of Palestine*, officers arrived on the scene to find the subject, Jacob Vincent Revill, inside a mobile home with the door open, yelling, and "brandishing an eighteen to twenty inch sword."  333 F.3d 621, 622 (5th Cir. 2013).  The officers told Revill to drop the sword, but he did not comply.  *Id.*  Revill exited the mobile home, and began making punching motions with the sword.  *Id.* at 623.  When Revill was "between eight and ten feet" from the officers, he turned toward them and raised the sword.  *Id.*  One of the officers fired and struck Revill in the right arm.  *Id.*  Revill later died of his injuries.  *Id.*  The Fifth Circuit ruled that the officer did not violate Revill's constitutional right to be free from excessive force because it was not "objectively unreasonable for an officer in that situation to believe that there was a serious danger to himself and the other officers present." *Id.* at 625.

In *Elizondo v. Green*, Officer W.M. Green was dispatched to the home of Ruddy Elizondo after being notified that Elizondo, a 17-year-old, was

suicidal and had stabbed himself. 671 F.3d 506, 508 (5th Cir. 2012). Green was directed to Elizondo's room, where he found the teen unhurt but holding a knife to his stomach. *Id.* Green drew his weapon and instructed Elizondo to drop his knife. *Id.* Elizondo did not comply and tried to close his bedroom door, but Green held the door open. *Id.* Elizondo eventually "moved closer to Green and raised the knife in a threatening motion." *Id.* Green fired his weapon and struck Elizondo three times, killing him. *Id.* The Fifth Circuit held that Green's use of deadly force was not clearly unreasonable because Elizondo "ignored repeated instructions to put down" his weapon, and when Green fired his weapon Elizondo "was hostile, armed with a knife, in close proximity to Green, and moving closer." *Id.* at 510.

Finally, in *Harris v. Serpas*, New Orleans police officers arrived at Brian Harris's home after being notified that Harris may have overdosed on sleeping pills. 745 F.3d at 770. The officers entered Harris's bedroom, where they found him lying on his back in his bed under a blanket. *Id.* The officers removed the blanket and saw that Harris was holding a folding knife. *Id.* The officers gave Harris verbal commands to drop the knife, but he refused. *Id.* The officers fired a Taser at Harris, but the Taser failed to incapacitate him. *Id.* Harris then stood up out of his bed and began flailing his arms. *Id.* He continued to refuse to comply with the officers' demands to drop the

weapon, and then raised the knife above his right shoulder in a stabbing position. *Id.* One of the officers fired three bullets at Harris, killing him. *Id.* at 770-71. The Fifth Circuit held that the officers were entitled to qualified immunity because "they reasonably believed that the suspect posed a threat of serious harm to the officer or to others." *Id.* at 773 (quoting *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011)).

These cases establish that in this Circuit it is not unreasonable for an officer to fear for his safety or the safety of others when the subject (1) is wielding a knife in close proximity to the officer or others, (2) is advancing toward the officer or others, and (3) is refusing to comply with commands. This was precisely the situation Officer Romano faced. Indeed, Officers Tusa and Cusimano both testified that they feared for their safety as Brown approached them.[62] And the undisputed fact that Officers Tusa and Cusimano both fired their non-lethal weapons at Brown around the time that Officer Romano fired his weapon supports their testimonies.[63]

Plaintiffs raise several points for why there is a genuine factual dispute as to whether Officer Romano's use of deadly force was clearly unreasonable. First, plaintiffs invite the Court to take into account all of the Kenner Police

---

[62]    *See* R. Doc. 50-14 at 55; R. Doc. 50-17 at 31.
[63]    R. Doc. 35-2 at 6-7; R. Doc. 50 at 21 n.45.

Department's actions, including the "confrontational use of aggressive tactics and various non-lethal weapons" prior to Officer Romano's use of deadly force, which plaintiffs allege "escalated the situation to the point where deadly force was more likely to be used."[64]   But in this Circuit "the excessive force inquiry is confined to whether the officer or another person was in danger *at the moment of the threat* that resulted in the officer's use of deadly force."   *Rockwell*, 664 F.3d at 992-93 (quoting *Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2011)) (emphasis in original); *see also Harris*, 745 F.3d at 772 ("[A]ny of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit.").   Plaintiffs suggest that the Court should disregard the Fifth Circuit's rule in light of Officer Romano's testimony that he took into account everything that had transpired during the course of the day when determining that Brown posed an immediate threat.[65]   But plaintiffs are conflating two distinct standards courts use when analyzing excessive force claims.   While the Court cannot consider the police officers' actions preceding the use of deadly force, the Court must "consider the totality of the circumstances as perceived by a reasonable officer" when determining

---

[64]    R. Doc. 50 at 15.
[65]    *See* R. Doc. 50-11 at 54.

whether the officer's use of deadly force was unreasonable. *Hatcher v. Bement*, 676 F. App'x 238, 243 (5th Cir. 2017) (citing *Graham*, 490 U.S. at 396). Officer Romano's awareness of Brown's mental instability and noncompliance with commands throughout the day is thus relevant to the Court's analysis, but the Kenner police officers' other actions preceding the use of deadly force are not. *See Rockwell*, 664 F.3d at 992-93; *Ramirez v. Knoulton*, 542 F.3d 124, 131 (5th Cir. 2008) (finding that an officer reasonably feared for his life when he was previously "on notice that [the victim] was armed, emotionally unstable, and potentially suicidal").

Second, plaintiffs argue that there is a genuine and material dispute as to whether Officers Tusa and Cusimano were safely behind the pedestrian gate when Brown approached them.[66] Armond Brown, Sr. states in a sworn affidavit that when the pedestrian gate is closed, it "locks so that it cannot be pushed open."[67] Plaintiffs appear to conclude that when viewing this evidence in the light most favorable to them, Officers Tusa and Cusimano were safely behind a locked gate when Brown approached, and that it was

---

[66] R. Doc. 50 at 19-22; *see also* R. Doc. 50-17 at 41 (Officer Tusa explaining in his post-incident interview that the gate was shut); R. Doc. 50-14 at 34 (Officer Cusimano testifying that the gate was open).
[67] R. Doc. 50-12 at 3.

thus objectively unreasonable for Officer Romano to conclude that they were in immediate danger.

But the Court must view the scene from Officer Romano's perspective and ask whether it was unreasonable for him to believe that Officers Tusa and Cusimano were in danger. *Graham*, 490 U.S. at 396. The material inquiry is not whether the gate was in fact locked, but whether Officer Romano reasonably believed that the gate was not locked and did not provide the officers any protection. *See Ontiveros v. City of Rosenberg, Texas*, 564 F.3d 379, 381, 384 (5th Cir. 2009) (officer entitled to qualified immunity when he fired lethal shots at a victim he reasonably believed was reaching into his boot for a weapon, even though a subsequent search revealed there were no weapons); *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991) (in a deadly force Section 1983 lawsuit, ruling it was "irrelevant" whether the victim was "actually unarmed" when an officer reasonably believed the victim was reaching for a weapon). Officer Romano testified that when Brown advanced, Officers Tusa and Cusimano "were on the sidewalk on the outside of the fence . . . in between the fence and the street," but that he believed the gate did not provide them any protection because it "swayed both ways" and could not be locked.[68] Officer Romano held this belief

---

[68]     R. Doc. 50-11 at 49-50, 61-62.

because he had been standing near the gate earlier in the day and was notified by another officer that the gate did not lock.[69] Officer Romano thus had reason to believe that the pedestrian gate did not provide Officers Tusa and Cusimano any protection.

Finally, plaintiffs argue that by Officer Romano's own admission, Brown did not raise the knives over his head or make any stabbing motions or thrusts, which plaintiffs suggest made it unreasonable for Officer Romano to perceive Brown as an immediate threat.[70] The Court notes that unlike here, in *Mace*, *Elizondo*, and *Harris* the victims raised their weapons in a threatening manner before the officers fired. *Mace*, 333 F.3d at 623 (the victim "raised [his] sword toward the officers" immediately before the officer fired his weapon); *Elizondo*, 671 F.3d at 508 (Elizondo "moved closer" to the officer and "raised [his] knife in a threatening motion"); *Harris*, 745 F.3d at 770 (Harris "raised the knife above his right shoulder in a stabbing position"). Brown, by contrast, never raised his knives over his head or made an attempt to strike Officer Tusa or Cusimano; rather, he held the knives out in front of his body pointed vertically when Officer Romano fired.[71]

---

[69]     *Id.* at 64-65.  Officer Cusimano similarly testified that the gate did not offer him any protection because it could not be locked and would freely swing open if Brown attempted to push it.  R. Doc. 50-14 at 35.
[70]     R. Doc. 50 at 9; *see also* R. Doc. 50-11 at 60.
[71]     R. Doc. 50-11 at 59-60.

But this minor distinction from *Mace*, *Elizondo*, and *Harris* does not render Officer Romano's use of deadly force unreasonable. First, the Court does not find it unreasonable for an officer to perceive as a threat a noncompliant individual holding two knives in front of his body pointed vertically and advancing towards others, even if the individual does not raise the knives over his head or make a stabbing motion. Second, plaintiffs' argument suggests that the reasonableness of Officer Romano's actions turns on whether Brown was attempting to strike the officers the moment Officer Romano fired his weapon. But that is not the case. In *Mace*, for instance, the victim made the threatening motions with his sword "within eight to ten feet" of the officers when he was shot. 333 F.3d at 625. He was not in the midst of rendering a blow on anyone the moment the officer fired. The material inquiry is instead whether Officer Romano reasonably feared that Officers Tusa and Cusimano were in immediate danger. And this Circuit's precedents establish that it is not unreasonable for an officer to fear for his safety or the safety of others when the victim is wielding a knife, refusing to comply with demands, and advancing to within ten feet of the officer or others. Here, Officer Romano was additionally aware that Brown was suffering from a mental illness, that Officers Tusa and Cusimano were armed with only non-lethal weaponry, and that sponge rounds and Tasers had

previously failed to incapacitate Brown.[72]  When viewing these facts and this Circuit's precedents as a whole, the Court cannot find that Officer Romano's use of force was clearly unreasonable.

And even if the Court were to determine that Officer Romano violated Brown's constitutional rights, the Court could not say that he violated clearly established law under the second prong of the qualified immunity analysis. When the Fifth Circuit has found at the summary judgment stage that an officer violated a clearly established constitutional right, the offending officers fired their weapons when the victim was completely incapacitated or standing still at a safe distance away, and thus did not pose an immediate threat to anyone's safety.  *See, e.g.*, *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268 (5th Cir. 2015); *Reyes v. Bridgwater*, 362 F. App'x 403 (5th Cir. 2010).

In *Mason*, a police officer shot the victim, Quamaine Mason, five times when the officer believed Mason was reaching for a gun in his waistband. 806 F.3d at 273.  The officer then fired two additional shots into Mason's back while he lay face down in a prone position.  *Id.* at 274.  The factual evidence, when viewed in a light most favorable to the plaintiffs, suggested that Mason only "pick[ed] up his head and put it back down" while he was

---

[72]      *Id.* at 23-24, 50-51.

lying face down, and did not move any other part of his body. *Id.* at 277. The Court denied defendants' motion for summary judgment because a reasonable jury could conclude that when the officer fired the final two shots, Mason would have appeared incapacitated to an objectively reasonable officer. *Id.* at 278. The Court held that shooting an incapacitated subject is inconsistent with the clearly established rule "that deadly force is unconstitutional when a 'suspect poses no immediate threat to the officer and no threat to others.'" *Id.* (quoting *Garner*, 471 U.S. at 11).

In *Reyes*, the officers were called to a residence because two brothers were fighting. 362 F. App'x at 404. The officers confronted Jose Ceballos, Jr. in the entryway to the apartment. *Id.* at 405. Ceballos held a knife in one hand and a cigarette in the other. *Id.* The officers instructed Ceballos to drop his knife, but he refused. *Id.* According to Ceballos's family members who witnessed the incident, Ceballos then flicked his cigarette butt non-aggressively, stood still while swaying side to side, and did not raise his knife. *Id.* One of the officers then fatally shot Ceballos in the chest. *Id.* The Fifth Circuit ruled that there was a genuine dispute whether the officer was entitled to qualified immunity, because the family members' version of events indicated Ceballos did not pose an immediate threat to the officers' safety. *Id.* at 408-09.

Here, there is no genuine dispute that when Officer Romano fired his weapon, Brown was neither incapacitated nor standing still with the knives at his side. Joshua Brown testified that when Jairon was shot he was holding two knives, advancing towards Kenner police officers, and refusing to comply with the officers' commands.[73] Under these circumstances, it is not the case that every reasonable officer would have understood that Officer Romano's use of deadly force was objectively unreasonable and in violation of clearly established law. *See Clayton*, 547 F. App'x at 653 (finding that an officer did not violate clearly established law when he shot and killed a noncompliant, belligerent man who approached to within five feet of the officer, even though the parties disputed whether the victim was armed the moment he was shot).

## B.    *Monell* Claims

In the absence of a constitutional violation, there can be no municipal *Monell* liability for the City of Kenner. *See Harris*, 745 F.3d at 774; *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009). The Court therefore grants summary judgment for the defendants on plaintiffs' claims under *Monell*.

---

[73]    R. Doc. 50-2 at 56-58.

### C.    State Law Claims

Having determined that plaintiffs' federal claims must be dismissed, the Court declines to exercise supplemental jurisdiction over their remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). "When a court dismisses all federal claims before trial, the general rule is to dismiss any [supplemental] claims." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). Further, "the Supreme Court has counseled that the dismissal of all federal claims weighs heavily in favor of declining jurisdiction." *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998), *overruled on other grounds by Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003). The Court therefore dismisses plaintiffs' remaining state law claims without prejudice. *See Bass*, 180 F.3d at 246 ("[T]he dismissal of . . . pendent [state] claims should expressly be *without* prejudice so that the plaintiff may refile his claims in the appropriate state court.") (emphasis in original).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment on all claims.

New Orleans, Louisiana, this __22nd__ day of October, 2018.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE